## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLARENCE STAMM,** | : | No.: |
| | : | |
| **Plaintiff,** | : | **COMPLAINT IN CIVIL ACTION** |
| | : | |
| **v.** | : | *Filed on behalf of Plaintiff*: |
| | : | CLARENCE STAMM |
| **IRON MOUNTAIN, INC.,** | : | |
| | : | *Counsel of Record for this Party*: |
| **Defendant.** | : | Thomas W. King, III |
| | : | PA. I.D. No. 21580 |
| | : | tking@dmkcg.com |
| | : | Thomas E. Breth |
| | : | PA. I.D. No. 66350 |
| | : | tbreth@dmkcg.com |
| | : | Jordan P. Shuber |
| | : | PA. I.D. No. 317823 |
| | : | jshuber@dmkcg.com |
| | : | |
| | : | **DILLON McCANDLESS KING** |
| | : | **COULTER & GRAHAM, LLP** |
| | : | 128 West Cunningham Street |
| | : | Butler, PA 16001 |
| | : | Telephone: (724) 283-2200 |
| | : | Facsimile: (724) 283-2298 |
| | : | |
| | : | Matthew E. Fischer |
| | : | PA. I.D. No. 58449 |
| | : | mattlaw@zoominternet.net |
| | : | *Pro Hac Vice pending* |
| | : | |
| | : | **LAW OFFICE OF** |
| | : | **MATTHEW E. FISCHER** |
| | : | 114 West Cunningham Street |
| | : | Butler, PA 16001 |
| | : | Telephone: (724) 282-6968 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CLARENCE STAMM,** | : |
| | : **No.:** |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **IRON MOUNTAIN, INC.,** | : |
| | : |
| **Defendant.** | : |
| | : |

## COMPLAINT IN CIVIL ACTION

NOW COMES Plaintiff, Clarence Stamm, by and through the undersigned legal counsel to file the within Complaint in Civil Action for violation of Plaintiff's First Amendment Rights, averring in support thereof as follows:

PARTIES

1.    Plaintiff, Clarence Stamm, is an adult individual, registered voter, former employee of Defendant, and a resident of Butler County, Commonwealth of Pennsylvania, which is located within the United States District Court for the Western District of Pennsylvania (hereinafter referred to as "Mr. Stamm" or "Plaintiff").

2.    Mr. Stamm is a member of the Republican Party of Pennsylvania and at all times relevant to this Complaint is an active supporter of the candidacy of President Donald J. Trump and President Trump's Make America Great Again ("MAGA") agenda.

1

3.      Defendant, Iron Mountain, Inc., is a Delaware Corporation with registered offices located at 85 New Hampshire Avenue, Suite 150, Portsmouth, New Hampshire (hereinafter referred to as "Iron Mountain" or "Defendant").

4.      Defendant has business operations throughout the United States, including, but not limited to, an underground facility located in Boyers, Butler County, Commonwealth of Pennsylvania (hereinafter referred to as "Boyers Facility").

5.      Defendant has numerous contracts with the United States government and various state governments under which Defendant performs traditional and exclusive public functions for the United States government.

6.      At all times relevant to the within Complaint, Plaintiff was employed by Defendant at its Boyers Facility.

## JURISDICTION AND VENUE

7.      This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332(a)(1) in that this matter involves violations of Plaintiff's rights under the laws and Constitution of the United States; as well as under the laws and Constitution of this Commonwealth, and there is complete diversity of citizenship between Plaintiff and Defendant.

8.      Venue is proper under 28 U.S.C. § 1391 because Plaintiff resides within the Western District of Pennsylvania; and the events giving rise to the claims occurred within the Western District of Pennsylvania.

9.    The amount in controversy exceeds $75,000.00, as Plaintiff seeks compensatory, nominal, and punitive damages, along with legal fees and costs in an amount greater than $75,000.00.

## FACTUAL BACKGROUND
## PROTECTED ACTIVITY

10.    On July 13, 2024, presidential candidate, President Donald J. Trump (hereinafter referred to as "President Trump") held an outdoor campaign rally at the Butler Farm Show grounds located in Butler Township, Butler County, Commonwealth of Pennsylvania (hereinafter referred to as the "Rally").

11.    Tens of thousands of supporters from across the Country attended the outdoor Rally, including Plaintiff, during which the attendees assembled for the common goal of expressing their support for President Trump and other Republican candidates for elected public office.

12.    Most of the attendees arrived at the Farm Show grounds hours before President Trump was scheduled to arrive, during which time numerous elected officials and dignitaries made speeches in support of President Trump's candidacy for President of the United States and President Trump's MAGA agenda for the Country.

13.    Like the other attendees, Plaintiff expressed his support and agreement with the various speeches of the elected officials and dignitaries as they encouraged the attendees to support President Trump and other Republican candidates for public office.

14.     Throughout the afternoon, Plaintiff interacted with countless fellow supporters of President Trump who were enjoying the shared experience of the Rally and their common goal of electing President Trump as the 47th President of the United States in November 2024.

15.     Prior to leaving for the Rally, Plaintiff grabbed a sun visor from his vehicle to help protect himself from the extreme sun and heat of the day.

16.     Throughout the Rally, numerous attendees (estimated to be in the hundreds) required medical treatment resulting from temperatures exceeding 90 degrees with little to no cloud cover to shield attendees from the sun.

17.     Around 6:00 p.m. local time, President Trump ascended the stage at the Butler Farm Show Grounds to begin a speech outlining his MAGA agenda for the Country.

18.     Throughout his campaign, President Trump set forth his MAGA agenda which included securing our Country's borders, eliminating government waste, improving government efficiency, restoring economic growth, protecting women in sports, and eliminating the diversity, equity, and inclusion ("DEI") mandates.

19.     Plaintiff attended the Rally to express his support for President Trump and his MAGA agenda because Plaintiff believes in the MAGA agenda set forth by President Trump.

20.     Unfortunately, at 6:11 p.m. local time, shortly after President Trump started his speech, numerous shots were fired from a vile assassin's rifle, including, one bullet that struck President Trump, and several other bullets that killed a brave attendee, Corey Comperatore, and seriously wounded two other attendees.

21.     As the Secret Service officers encircled President Trump to escort him from the stage, a wounded President Trump defiantly encouraged Plaintiff and the other attendees to "fight, fight, fight" to MAGA.

22.     As President Trump was escorted from the stage, Plaintiff and the other attendees chanted "USA, USA, USA" in support of President Trump and the United States of America.

23.     Despite the traumatic assassination attempted upon President Trump, Plaintiff's participation in the Rally and his interactions with the other attendees at the Rally served to reinforce and grow his commitment to President Trump and his MAGA agenda.

24.     Upon returning home from the Rally, Plaintiff watched the media coverage of the Rally, and the failed assassination attempt upon President Trump.

25.     World-wide media coverage consisted of countless video replays of the assassination attempt which captured background images of the attendees at the Rally.

26.     In one of the video replays, Plaintiff noticed that he could be seen in the background along with numerous other attendees in the Rally.

27.    Plaintiff was proud of his participation in the historic Rally, his support for President Trump and his MAGA agenda, and President Trump's defiant response to the failed attempt to kill him and his MAGA agenda.

28.    Many of Plaintiff's friends watched the media coverage of the assassination attempt upon President Trump.

29.    A few of Plaintiff's friends notice him on the television coverage of the Rally and texted Plaintiff screenshots of him at the Rally.

30.    Plaintiff communicated with his friends to let them know that he was not one of the victims of the failed assassination attempt and to let them know that he was safe.

31.    Prior to the Rally, Plaintiff discussed with his Supervisor at Iron Mountain that he was going to attend the Rally.

32.    After the Rally, Plaintiff's Supervisor texted Plaintiff to make sure that he was alright, so Plaintiff shared a copy of the picture with his supervisor along with the message that he was fine.

33.    Plaintiff included the comment about his Iron Mountain sun visor because during their prior conversation regarding the Rally, Plaintiff and his Supervisor were joking about Plaintiff wearing his uniform to the Rally.

## EMPLOYMENT WITH IRON MOUNTAIN

34.    In July 2014, Plaintiff began working for Defendant at its Boyers Facility.

35.    As a condition of his employment, Defendant required Plaintiff to undergo a detailed background check to obtain the mandatory security clearances required for his job.

36.    Once hired, Plaintiff was required to maintain his security clearances as a condition of his continued employment.

37.    At all times relevant to this Complaint, Plaintiff obtained and maintained his security clearances as a condition of his employment with Defendant.

38.    During his ten (10) years of employment with Defendant, Plaintiff was a reliable and conscientious employee who was recognized by Defendant for his outstanding job performance on several occasions.

39.    Throughout his employment with Iron Mountain, Defendant gave its employees, including Plaintiff, various miscellaneous items with the Iron Mountain corporate logo ("Promotional Merchandise"), such as, apparel, hats, and similar items, including the sun visor worn by Plaintiff at the Rally.

40.    Employees would take the Promotional Merchandise home with them and freely use it in their daily lives within their respective communities.

41.    Prior to the Rally, Plaintiff had worn his sun visor countless times in the community.

42.    Defendant supplied its employees with Promotional Merchandise for various public events, activities, and causes sponsored or supported by Defendant.

43.    Employees were encouraged by Defendant to wear the Promotional Merchandise while participating in the events, activities, and causes sponsored or supported by Defendant.

44.    Employees were also encouraged to participate in events, activities, and causes within their respective communities.

45.    At all times relevant to this Complaint, Defendant did not have a written policy prohibiting its employees from wearing Defendant's Promotional Merchandise within their respective communities.

46.    At all times relevant to this Complaint, Defendant did not have a written policy limiting the time, place, or manner of their employees' wearing of the Promotional Merchandise within their respective communities.

47.    To the contrary, Defendant encouraged its employees to freely wear Defendant's Promotional Merchandise while participating in the events, activities, and causes within their respective communities.

STATE ACTOR

48.    Defendant is a "state actor" subject to the laws and Constitution of the United States and the Commonwealth of Pennsylvania.

49.    "[A] private entity can qualify as a state actor in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function, see, *e.g., Jackson*, 419 U. S., at 352-354, 95 S.

Ct. 449, 42 L. Ed. 2d 477; (ii) when the government compels the private entity to take a particular action, see, *e.g., Blum* v. *Yaretsky*, 457 U. S. 991, 1004-1005, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982); or (iii) [****11] when the government acts jointly with the private entity, see, *e.g., Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 941-942, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982)." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 139 S. Ct. 1921, 204 L. Ed. 2d 405, (2019 U.S.).

50.   ". . . to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally *and* exclusively performed the function." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 139 S. Ct. 1921, 204 L. Ed. 2d 405, (2019 U.S.), citing, *Rendell-Baker* v. *Kohn*, 457 U. S. 830, 842, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982); *Jackson*, 419 U. S., at 352-353, 95 S. Ct. 449, 42 L. Ed. 2d 477; *Evans* v. *Newton*, 382 U. S. 296, 300, 86 S. Ct. 486, 15 L. Ed. 2d 373 (1966).

51.   Defendant has various contracts with the United States government under which Defendant performs functions that are and have traditionally been public functions exclusively performed by the United States government.

52.   According to the U.S. General Services Administration ("GSA") website, Defendant has various contracts with the federal government, including, contracts related to the storage, maintenance, and retrieval of various classified records of the government of the United States.

53.     GSA lists Defendant as an approved contractor with the required security clearances to handle classified information and documents in compliance with the GSA Clearance Verification-Passing Procedure, which strictly regulates the access to and release of classified records.

54.     Defendant's facilities, including Defendant's Boyers Facility, are used, under contract between Defendant and the United States government, to store "secret classification level" records in compliance with the National Industrial Security Program Operating Manual ("NISPOM").

55.     The NISPOM strictly regulates how classified records are secured, stored, maintained, transported, and accessed by authorized parties.

56.     The handling of classified documents, information, and records of the United States government is a function that is and has always been traditionally and exclusively a function of the United States government.

57.     The United States government has contracted with Defendant to act jointly to secure, protect, and maintain the classified records of the United States government.

58.     Defendant's facilities, including Defendant's Boyers Facility, are used, under contract between Defendant and the United States government, to store various records of the National Archives of the United States government in compliance with

the National Archives and Records Administration ("NARA") facility standards, 36 CFR § 1234.

59.    The NARA facility standards strictly regulate how records of the National Archives of the United States government are secured, stored, maintained, transported, and accessed by authorized parties.

60.    The handling of the records of the National Archives of the United States government is a function that is and has always been traditionally and exclusively a function of the United States government.

61.    The United States government has contracted with Defendant to act jointly to secure, protect, and maintain records of the National Archives of the United States government.

TERMINATION OF EMPLOYMENT

62.    On July 18, 2024, just five days after the failed assassination attempt, Defendant emailed Plaintiff a letter ("Termination Letter"), attached as Exhibit "A," in which Defendant notified Plaintiff that Defendant had terminated Plaintiff's employment with Iron Mountain.

63.    Defendant indicated to Plaintiff that his employment was terminated because the sun visor worn by Plaintiff at the Rally was an Iron Mountain sun visor.

64.    The sun visor worn by Plaintiff was part of Defendant's Promotional Merchandise that was given to Defendant's employees.

65.    Defendant's Termination Letter stated in relevant part as follows:

"To recap, leadership became aware of you wearing an Iron Mountain logo'd visor to a political rally on 7/13/2024 when you texted the following picture and caption to your Supervisor:



I'm fine Keith.
Did you see I made it on
Fox News wearing my
Iron Mountain sun visor!!!

Clarence, this behavior is considered unprofessional and unacceptable and in direct violation of Iron Mountain policies, especially the Code of Conduct and Core Values. Therefore, your employment is terminated effective July 18, 2024."

74.    Upon receipt of his termination letter, Plaintiff was shocked by Defendant's termination of his employment based upon pretextual assertions that Plaintiff had allegedly directly violated Defendant's "policies, especially the Code of Conduct and Core Values" of Iron Mountain. A true and correct copy of Defendant's termination letter is attached hereto as Exhibit "A" and incorporated by reference as if fully set forth herein.

75.    Defendant never explained how Plaintiff's participation in the Rally constituted "unprofessional" or "unacceptable" behavior.

76.    Nor did Defendant ever provide Plaintiff with the specific sections of Defendant's policies or Code of Conduct and Core Values that Plaintiff allegedly violated by attending the Rally.

77.    Plaintiff's employment with Iron Mountain was terminated because Defendant and its agents did not like the fact that Plaintiff attended the Rally to support President Trump and his MAGA agenda while wearing Defendant's Promotional Merchandise.

78.    Defendant's justification to terminate Plaintiff's employment is pretextual and unsupported by Defendant's policies and Code of Conduct and Core Values.

79.    Defendant provides its employees with a document titled, "Iron Mountain Incorporated – Code of Ethics and Business Conduct" ("Code") and the employees are required to sign a Compliance Certificate. A true and correct copy of the Code is attached hereto as Exhibit "B," which is incorporated herein by reference as if fully set forth herein.

80.    Section IV – <u>Compliance with Laws, Rules and Regulations</u> states in relevant part "… all employees acting on behalf of the Company will obey such laws and regulations. The Company is committed to: (e) keeping the political activities of the Company's employees separate from the Company's business; . . . (f) prohibiting

any illegal payments to any government officials or political party representatives of any country;".

81.    Nowhere in Defendant's Code of Ethics and Business Conduct does it prohibit or restrict its employees from wearing Defendant's Promotional Merchandise in their respective communities.

82.    To the contrary, in April 2024, Defendant posted on its X account this statement and picture:

> Moving Mountains is an initiative to encourage Iron Mountain employees to support the causes that are important to them. We're proud to help our employees in their efforts to make positive changes in their communities.
>
> #NationalVolunteerWeek #NVW #MovingMountains



https://x.com/IronMountain/status/1782756313971249202

83.    In August 2024, Defendant posted on its Facebook page this statement
and picture:

> We're thrilled to announce that Iron Mountain employees from 36 countries
> have collectively contributed 100,000 hours of volunteer service to communities
> around the globe!
>
> This milestone is a testament to the incredible dedication and spirit of our team
> members who have worked tirelessly to make a positive impact. From
> environmental clean-ups and mentoring youth to supporting local charities and
> disaster relief efforts, our employees have truly embodied the heart of
> community service.
>
> A massive thank you to every volunteer who has given their time and energy.
> Your efforts not only strengthen our communities but also inspire others to join
> in!
>
> #OneIronMountain #CommunityImpact #Volunteerism #MakingADifference



https://www.facebook.com/IronMountainMENAT/photos/were-thrilled-to-announce-that-iron-mountain-employees-from-36-countries-have-co/1262949445121785/

84.    Most of the employees, if not all of the employees, in these pictures are wearing Defendant's Promotional Merchandise while participating in various events, activities, and causes within their respective communities.

85.    None of the employees in these pictures were disciplined for wearing Defendant's Promotional Merchandise while participating in events, activities, or causes in their community.

86.    Lauren Boudreau-Steeves works for Defendant as the Senior Manager, Sales Enablement, and she has a LinkedIn account on which she posted the following:



87.    In July 2022, Defendant posted the following statement on its website in an article titled, "Getting to the Heart of the Mountain":

Iron Mountain has always encouraged its employees to find ways to give

back to their communities. In 2020, we made that a little easier by initiating global paid time-off volunteer service.

Full-time employees worldwide get 16 hours paid time-off per year to contribute to civic action or service in their communities, while part-timers get 8 hours. In using the paid time off, volunteer activities can include charitable work, voting, and even poll-working.

During May, which we've named "Moving Mountains Month," Mountaineers logged 2,000 volunteer hours around the world. This included paid time off as well as time volunteering outside of working hours.

https://www.ironmountain.com/about-us/news-and-stories/stories/2022/july/getting-to-the-heart-of-the-mountain

88.    In April 2024, Defendant posted an article on its website titled "Passion Guides Mountaineer Leaders to Support Fellow Employees."

89.    In the article, Defendant describes Employee Resource Groups ("ERG") that Defendant established with the mission to support personal and professional growth through shared life experiences, backgrounds, and characteristics.

90.    These ERG's, such as the Women@IM ERG, are described by an Iron Mountain employee on Defendant's website as ". . . providing a safe space for dialogue; challenging the status quo; educating and opening minds and perspectives; being able to share useful resources to those who need them . . ."

https://www.ironmountain.com/about-us/news-and-tories/stories/2024/april/passion-guides-mountaineer-leaders-to-support-fellow-employees.

91.     In addition to Defendant's Code, Defendant also provides its employees

with a document entitled, "Living Our Values Protecting What Matters," which

contains a page entitled "Code of Ethics and Business Conduct" (hereinafter referred

to as "Code of Ethics") of Iron Mountain. A true and correct copy of this document is

attached as Exhibit "C," which is incorporated by reference as if fully set forth herein.

92.     Page 5 of the Code of Ethics contains a "Message from Bill Meaney,

CEO," which states in relevant part as follows:

> "Read this document thoroughly, so you can understand and follow our policies
> and Values when you come to work and win business as Mountaineers. … Our
> success and our reputation rest on following our Code. On behalf of the Board
> of Directors and our executive leadership, I thank you for Living our Values and
> Protecting What Matters."

Exhibit C, p. 5.

93.     Page 16 of the Code of Ethics states in relevant part, "Who must follow

the Code? Every person conducting business for Iron Mountain must follow the Code,

including, employees, officers, agents, and members of the Board of Directors. The

Code applies to all Iron Mountain business units, legal entities, controlled joint

ventures, affiliates, and partnerships worldwide. There are no exceptions. …" Exhibit

C, p. 16.

94.     Nowhere in Defendant's Code of Ethics does it prohibit or restrict its

employees from wearing Defendant's Promotional Merchandise in their respective

communities.

95.    To the contrary, Defendant's Code of Ethics encourages its employees to participate and support causes in their respective communities.

96.    Page 42 of the Code of Ethics states in relevant part, "Valuing Inclusion and Diversity . . . Including and respecting diversity in our words and actions helps to maximize each employee's contribution and enables us to make better decisions." Exhibit C, p. 16.

97.    The above referenced statement is accompanied by a picture of individuals wearing Defendant's Promotional Merchandise (Iron Mountain PRIDE t-shirts) at a PRIDE parade:



98.    Much like the other employees identified above, Plaintiff attended the Rally to exercise his First Amendment right to freely speak in support of President Trump and his MAGA agenda.

99.    Plaintiff attended the Rally so that he could join with other individuals who shared his belief in President Trump and together they could exercise their First Amendment rights to freely speak in support of President Trump and his MAGA agenda.

100.    At all times relevant to this Complaint, Plaintiff was engaged in activities, speech, and association with others that is protected by the First Amendment.

101.    Not only does Defendant permit, but Defendant encourages its employees to engage in activities, speech, and association with others in their respective communities that is likewise protected by the First Amendment.

102.    Further, Defendant permits and encourages its employees to wear Promotional Merchandise while engaging in activities, speech, and association with others in their respective communities.

103.    Plaintiff believes, and therefore avers, that he is the only employee who has been terminated from employment for wearing Promotional Merchandise in his community.

104.    Defendant's decision to terminate Plaintiff's employment is pretextual, retaliatory, and was taken by individuals within Iron Mountain who have animosity towards President Trump and his MAGA agenda.

105.   Defendant's termination of Plaintiff's employment constitutes a violation of Plaintiff's First Amendment rights.

106.   As a result of Defendant's unlawful termination of Plaintiff's employment, Plaintiff has suffered damages, including, but not limited to, monetary damages, embarrassment, loss of reputation, and anxiety regarding his and his family's economic future.

107.   Punitive damages are appropriate under *42 U.S.C. § 1983* if "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade 461 U.S. 30, 56 (1983).*

108.   The defendant need not be proven to have been acting in a willful manner, the  requisite intent is "recklessness in its subjective form." *Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536, 144 L. Ed. 2d 494, 119 S. Ct. 2118 (1999).*

109.   The Court's focus should be on the Defendant's state of mind at the time the decision was made to terminate Plaintiff's employment. See, *Romano v. U-Haul Int'l, 233 F.3d 655, 669 (1st Cir. 2000)*, and whether there was a perceivable risk of violating Plaintiff's rights. See, *Kolstad 527 U.S. at 536; see also DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 38 (1st Cir. 2001).*

110.   Defendant's unlawful conduct towards Plaintiff warrants an award of punitive damages against Defendant.

COUNT I
Violation of Plaintiff's First Amendment Free Speech Rights
42 U.S.C. § 1983

111.    The preceding Paragraphs are incorporated by reference and made a part hereof as if fully set forth herein.

112.    "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984) citing, Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley, 454 U.S. 290, 294 (1981).*

113.    "According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Roberts, supra. At 622, citing, Gilmore v. City of Montgomery, 417 U.S. 556, 575 (1974); Griswold v. Connecticut, 381 U.S. 479, 482-485 (1965); NAACP v. Button, 371 U.S. 415, 431 (1963).*

114.    "Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts, supra. at 622, citing, NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907-909, 932-933 (1982); Larson v. Valente,*

*456 U.S. 228, 244-246 (1982)*; *In re Primus, 436 U.S. 412, 426 (1978); Abood v. Detroit Board of Education, 431 U.S. 209, 231 (1977)*.

115.   Defendant has a well-documented history of permitting and encouraging its employees to engage in a variety of events, activities, and causes protected by the Free Speech Clause of the First Amendment.

116.   Defendant's "Moving Mountains" initiative is intended to encourage Defendant's employees "to support the causes that are important to them."

117.   Defendant is "proud to help" its employees "in their efforts to make positive changes in their communities."

118.   Except for Plaintiff, despite Defendant's public statements to the contrary, when Plaintiff made the decision to support a cause important to him (attending a Rally in support of President Trump and his MAGA agenda), Defendant informed him that his conduct was "considered unprofessional and unacceptable" and that his employment had been terminated.

119.   Plaintiff's employment was terminated solely because of the content of his speech.

120.   The content of Plaintiff's speech (participation in a Rally supporting President Trump and his MAGA agenda) is protected speech.

121.   Defendant is a "state actor" subject to the laws and Constitution of the United States and the Commonwealth of Pennsylvania.

122.  Although a private entity, Defendant qualifies as a state actor because Defendant performs a traditional, exclusive public function; and Defendant and the United States government act jointly to secure, preserve, maintain, and protect classified information and documents of the United States government.

123.  The function of securing, preserving, maintaining, and protecting classified information and documents of the United States government is a function traditionally and exclusively performed by the United States government.

124.  Defendant performs this exclusive government function pursuant to various contracts with the United States government.

125.  At all times relevant to this Complaint, Defendant and the employees who made the decision to terminate Plaintiff's employment were state actors subject to the laws and Constitutions of the United States and the Commonwealth of Pennsylvania.

126.  As a result of Defendant's unlawful termination of Plaintiff's employment, Plaintiff has suffered damages, including, but not limited to, monetary damages, embarrassment, loss of reputation, and anxiety regarding his and his family's economic future.

127.  Defendant's unlawful conduct towards Plaintiff warrants an award of punitive damages against Defendant.

## COUNT II
Violation of Plaintiff's First Amendment Freedom of Association Rights

42 U.S.C. § 1983

128.    The preceding Paragraphs are incorporated by reference and made a part hereof as if fully set forth herein.

129.    "When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. For Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021), citing, *NAACP v. Button,* 371 U. S. 415, 433 (1963).

130.    On July 13, 2024, Plaintiff joined tens of thousands of other supporters from across the Country who attended the outdoor Rally to support then presidential candidate, President Donald J. Trump and his MAGA agenda.

131.    Unlike many of the participants at the Rally, Plaintiff did not need to travel across the Country to attend the Rally, which took place at the Butler County Farm Show grounds in Butler County, Pennsylvania.

132.    Plaintiff along with most of the attendees arrived at the Farm Show grounds hours before President Trump was scheduled to arrive, during which time numerous elected officials and dignitaries made speeches in support of President Trump's candidacy for President of the United States and President Trump's MAGA agenda for the Country.

133. Like the other attendees, Plaintiff expressed his support and agreement with the various speeches of the elected officials and dignitaries as they encouraged the attendees to support President Trump and other Republican candidates for public office.

134. Throughout the afternoon, Plaintiff interacted with countless fellow supporters of President Trump who were enjoying the shared experience of the Rally and their common goal of electing President Trump as the 47th President of the United States in November 2024.

135. At all times relevant to this Complaint, Plaintiff's attendance at the Rally was protected by the First Amendment of association.

136. Not only does Defendant permit, but Defendant actively encourages, its employees to associate and assemble with others in a shared effort to further causes important to the employees and their community.

137. Further, Defendant permits and encourages its employees to wear Promotional Merchandise while the employees associate and assemble with others in a shared effort to further causes important to the employees and their community.

138. Plaintiff believes, and therefore avers, that he is the only employee who has been terminated from employment for wearing Promotional Merchandise while associating and assembling with others in a shared effort to further causes important to the employee.

139.    Defendant's decision to terminate Plaintiff's employment is pretextual, retaliatory, and was taken by individuals within Iron Mountain who have animosity towards Plaintiff for his support of President Trump and his MAGA agenda.

140.    Defendant's termination of Plaintiff's employment constitutes a violation of Plaintiff's First Amendment rights.

141.    As a result of Defendant's unlawful termination of Plaintiff's employment, Plaintiff has suffered damages, including, but not limited to, monetary damages, embarrassment, loss of reputation, and anxiety regarding his and his family's economic future.

142.    Defendant's unlawful conduct towards Plaintiff warrants an award of punitive damages against Defendant.

COUNT III
Retaliation against Plaintiff for Exercising his
First Amendment Free Speech Rights
42 U.S.C. § 1983

143.    The preceding Paragraphs are incorporated by reference and made a part hereof as if fully set forth herein.

144.    "First Amendment retaliation claim asserting a violation of the right to free speech requires a plaintiff to prove that '(1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link existed between the constitutionally protected conduct and the retaliatory

action.'" *Williams v. City of Allentown, 804 Fed. Appx. 164, 167 (2020), quoting, Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (internal quotation marks and citation omitted).

145.   "Claims of retaliation for the exercise of First Amendment rights are cognizable under *§ 1983*." *See*, e.g., *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle, 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977)* (school board's refusal to renew untenured teacher's contract in retaliation for exercise of right to free speech actionable).

146.   "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU of Md., Inc. v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993)*.

147.   To prevail in a *§ 1983* claim of retaliation for protected First Amendment activity, plaintiff must establish that his protected conduct was a substantial or motivating factor in defendant's retaliatory decision. *Mt. Healthy supra. at 287*.

148.   As set forth above, at all times relevant to this Complaint, Plaintiff engaged in constitutionally protected conduct.

149.   As a direct result of Plaintiff's constitutionally protected conduct, Defendant engaged in retaliatory action, terminating Plaintiff's employment, which

action is sufficiently severe to deter a person of ordinary firmness from exercising his or her constitutional rights.

150.   As indicated in Defendant's letter to Plaintiff, Plaintiff's employment was terminated as a direct result of Plaintiff's constitutionally protected conduct.

151.   Defendant retaliated against Plaintiff because individuals within Iron Mountain have animosity towards Plaintiff for his support of President Trump and his MAGA agenda.

152.   Defendant's termination of Plaintiff's employment constitutes retaliation against Plaintiff for engaging in conduct protected by the First Amendment.

153.   As a result of Defendant's unlawful termination of Plaintiff's employment, Plaintiff has suffered damages, including, but not limited to, monetary damages, embarrassment, loss of reputation, and anxiety regarding his and his family's economic future.

154.   Defendant's unlawful conduct towards Plaintiff warrants an award of punitive damages against Defendant.

COUNT IV
Retaliation against Plaintiff for Exercising his
First Amendment Freedom of Association Rights
42 U.S.C. § 1983

155.   The preceding Paragraphs are incorporated by reference and made a part hereof as if fully set forth herein.

156.   As set forth above, at all times relevant to this Complaint, Plaintiff associated and assembled with tens of thousands of other Rally participants at the Rally to support President Trump and his MAGA agenda.

157.   As a direct result of Plaintiff's constitutionally protected right to assemble with others to further their First Amendment rights, Defendant engaged in retaliatory action, terminating Plaintiff's employment, which action is sufficiently severe to deter a person of ordinary firmness from exercising his or her constitutional right to assemble with others.

158.   As indicated in Defendant's letter to Plaintiff, Plaintiff's employment was terminated as a direct result of Plaintiff's constitutionally protected conduct.

159.   Defendant retaliated against Plaintiff because individuals within Iron Mountain have animosity towards Plaintiff and others who support President Trump and his MAGA agenda.

160.   Defendant's termination of Plaintiff's employment constitutes retaliation against Plaintiff for engaging in conduct protected by the First Amendment.

161.   As a result of Defendant's unlawful termination of Plaintiff's employment, Plaintiff has suffered damages, including, but not limited to, monetary damages, embarrassment, loss of reputation, and anxiety regarding his and his family's economic future.

162.   Defendant's unlawful conduct towards Plaintiff warrants an award of punitive damages against Defendant.

## COUNT V
## WRONGFUL TERMINATION OF EMPLOYMENT
### Under Pennsylvania Law

163.   The preceding Paragraphs are incorporated by reference and made a part hereof as if fully set forth herein.

164.   To establish a wrongful termination of employment claim under Pennsylvania law, Plaintiff must prove a clear mandate of public policy is violated; and there is no plausible and legitimate reason for terminating the at-will relationship. See *Geary v. U.S. Steel Corp., 456 Pa. 171, (1970).*

165.   Defendant's violation of Plaintiff's constitutional rights is a per se violation of public policy.

166.   The sole basis for Defendant's termination of Plaintiff's employment was directly related to Plaintiff engaging in conduct protected by the First Amendment.

167.   Defendant's termination of Plaintiff's employment constitutes wrongful termination of Plaintiff's employment for engaging in conduct protected by the First Amendment.

168.   As a result of Defendant's unlawful termination of Plaintiff's employment, Plaintiff has suffered damages, including, but not limited to, monetary

damages, embarrassment, loss of reputation, and anxiety regarding his and his family's economic future.

169.  Defendant's unlawful conduct towards Plaintiff warrants an award of punitive damages against Defendant.

RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above set forth Counts and causes of action as follows:

1. Judgment against Defendant, Iron Mountain, Inc., for compensatory and/or nominal damages in an amount in excess of the necessary to invoke the jurisdiction of this Court and reasonably calculated to fully compensate the Plaintiff for his monetary damages, embarrassment, loss of reputation, and anxiety regarding his and his family's economic future.

2. Judgment against Defendant, Iron Mountain, Inc., for punitive damages sufficient to deter Defendant from engaging in similar conduct in the future.

3. Reasonable attorney fees as provided by law.

4. Pre-judgment, post-judgment, and all other interest recoverable.

5. Statutory damages and other relief permitted under applicable law.

6. Such other additional relief as Plaintiff may be entitled to in law and equity.

DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure Rule 38(b), Plaintiff hereby demands a trial by jury as to all triable claims in this Complaint.

Respectfully submitted,

Dated: April 4, 2025

*/s/ Thomas W. King, III*
Thomas W. King, III
PA. I.D. No. 21580
tking@dmkcg.com

**DILLON McCANDLESS KING COULTER & GRAHAM, LLP**
128 West Cunningham Street
Butler, PA 16001
Telephone: (724) 283-2200